EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Oficina de Etica Gubernamental<br>       Recurrida<br><br>              v.<br><br>Carmenisa D. Rivera Santos<br>       Peticionaria<br>_____<br>Bethzaida Cintrón Lorenzo<br>     Peticionaria<br><br>              v.<br><br>Depto. de Asuntos del Consumidor<br>     Recurrido | 2001 TSPR 3 |

Número del Caso: CC-2000-744
                 AC-2000-66

Fecha: 12/enero/2001

**CC-2000-744**
Tribunal de Circuito de Apelaciones: Circuito Regional II

Panel integrado por su Presidente, Juez Sánchez Martínez, la Jueza Ramos Buonomo y la Jueza Cotto Vives

Abogado de la Parte Peticionaria: Lcdo. Héctor Santiago Rivera

Oficina de Etica Gubernamental: Lcda. Gretchen Camacho Rossy
                                Lcda. Wanda Torres Velázquez

Materia: Violación al Art. 3.3(b) de la Ley de Etica Gubernamental


**AC-2000-66**
Tribunal de Circuito de Apelaciones: Circuito Regional IV

Panel integrado por su Presidenta, la Juez López Vilanova y los Jueces Córdova Arone y Escribano Medina

Abogada de la Parte Peticionaria: Por Derecho Propio

Abogada de la Parte Recurrida: Lcda. Delia E. Pagán Robles

Materia: Impugnación de Traslado

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina de Ética Gubernamental

     Recurrida

         v.                          CC-2000-744

Carmenisa D. Rivera Santos

     Peticionaria

_____

Bethzaida Cintrón Lorenzo

     Peticionaria

         v.                          AC-2000-66

Depto. de Asuntos del Consumidor

     Recurrido


PER CURIAM


San Juan, Puerto Rico a 12 de enero de 2001


I


El **8 de septiembre de 2000** la peticionaria, Carmenisa D. Rivera Santos, presentó un recurso de certiorari ante este Tribunal al cual se le asignó el Núm. CC-2000-744; Oficina de Ética Gubernamental v. Carmenisa D. Rivera Santos. En dicho recurso nos solicita la revisión de una resolución emitida por el Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito) el 31 de julio de 2000 y archivada en autos copia de su notificación el **8 de agosto de 2000**.[1] Como parte del expediente, la señora Rivera Santos acompañó una moción en la que informó que el recurso ante este Tribunal debió ser presentado el 7 de septiembre de 2000. Adujo que a esa fecha lo único que le faltaba era incorporar los apéndices que se estaban fotocopiando en el negocio Post Net. Sin embargo, debido a la emergencia surgida en el sistema eléctrico, el 7 de septiembre, al Post Net le fue imposible entregarle los apéndices reproducidos. Alegó, que al ser dicha avería una situación de fuerza mayor se le debía permitir presentar el recurso un día más tarde, el 8 de septiembre.

De otra parte, también el **8 de septiembre**, la Lcda. Bethzaida Cintrón Lorenzo presentó ante este Tribunal un recurso de apelación al cual se le asignó el Núm. AC-2000-66, Bethzaida

_____

[1] En dicho recurso la señora Rivera Santos alega que la interpretación del Art. 3.3(B) de la Ley de Ética Gubernamental hecha por la Oficina de Ética Gubernamental es una tan amplia que viola el principio de legalidad dispuesto en el Art. 8 del Código Penal. También sostiene que el esquema diseñado para adjudicar las querellas en dicha oficina es inconstitucional ya que viola el debido proceso de ley al no garantizar una adjudicación imparcial.

<u>Cintrón Lorenzo</u> v. <u>DACO</u>.[2] En esencia cuestionó la determinación del Tribunal de Circuito de desestimar un recurso de revisión administrativa por craso incumplimiento con su Reglamento. Esta resolución fue notificada a las partes y archivada en autos copia de su notificación el 5 de julio de 2000. Oportunamente, es decir, el 20 de julio de 2000, la licenciada Cintrón Lorenzo presentó una solicitud de reconsideración. Ésta fue declarada sin lugar mediante Resolución de 4 agosto de 2000 y se archivó en autos copia de su notificación el **8 de agosto de 2000**.

El 11 de septiembre de 2000 la licenciada Cintrón Lorenzo presentó una moción informativa aduciendo que no pudo presentar el recurso el 7 de septiembre ya que ese día no hubo servicio de energía eléctrica, por lo que no pudo imprimirlo ni fotocopiarlo.

Como podemos observar, ambos recursos fueron presentados pasado el término jurisdiccional de treinta (30) días que establece la Sec. 4.7 de la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2177 y las Reglas del Reglamento del Tribunal Supremo de Puerto Rico de 1 de mayo de 1996, 4 L.P.R.A. Ap. XXI-A. Sin embargo, ignorar que el 7 de septiembre de 2000 la zona norte de la Isla, desde Fajardo hasta Arecibo, se vio afectada por un acontecimiento de fuerza mayor, por un caso fortuito, que no pudo ser previsto o que de ser previsto fue inevitable, sería no sólo ir en contra de las disposiciones legales pertinentes,[3] sino exigirle a las peticionarias lo imposible, aún cuando este Tribunal, en sus actuaciones reconoció que ese día sus labores no se pudieron llevar a cabo.[4]

Para propósitos de dilucidar el problema umbral de la supuesta falta de jurisdicción, hemos procedido a consolidar ambos recursos, exclusivamente en cuanto a este aspecto. Los planteamientos en los méritos continuarán dilucidándose en los casos individualmente.

II

El jueves, 7 de septiembre de 2000, la Autoridad de Energía Eléctrica (Autoridad) emitió el siguiente comunicado de prensa relacionado con una avería causada por "la interrupción masiva del servicio de electricidad," en una línea de transmisión de 230 KVA que afectó a la zona norte de la Isla, de Arecibo a Fajardo:[5]

> Alrededor de medio millón de clientes de la Autoridad de Energía Eléctrica se vieron privados del servicio de electricidad desde las 7:53 de esta mañana, cuando una de las líneas principales de transmisión salió de servicio, debido al impacto sufrido por árboles cercanos. Esta línea de transmisión,

---

[2]    Acogemos el recurso AC-2000-66 como uno de certiorari por ser el apropiado.

[3]    Véase, Art. 1058 del Código Civil, 31 L.P.R.A. sec. 3022.

[4]    El 7 de septiembre se despacharon la mayor parte de los empleados del Tribunal ya que la falta de servicio eléctrico les imposibilitaba realizar sus funciones.

[5]    De esta forma calificó la Autoridad la interrupción ocurrida en el servicio de electricidad el 7 de septiembre de 2000. Comunicado de Prensa de la Autoridad de Energía Eléctrica de 14 de septiembre.

identificada como la 50,200, tiene una capacidad de 230 KV (kilovoltios) y discurre entre la Central Termoeléctrica de Costa Sur y Manatí. La salida de servicio de <u>dicha línea afectó mayormente la población de la franja comprendida entre Arecibo y Fajardo.</u>

La Oficina de Prensa de la AEE indicó que el patrullaje aéreo de la línea, que los helicópteros de la AEE realizaron a lo largo de las 35 millas de extensión de la misma, detectó la avería en la vecindad de Peñuelas. Posteriormente a este incidente, en torno a las 8:16 de la mañana, las líneas 37,000 (115 KV) y 50,300 (230 KV), mediante las cuales se distribuyó la generación de electricidad que debía transmitir la línea averiada, sufrieron desperfectos que las sacó de servicio, también. <u>La suma de estos incidentes provocó que la zona norte del país se viera desconectada, de la Central Aguirre, una de sus principales generadoras de electricidad y de la Central San Juan.</u> Durante esta emergencia se pudo sobrellevar la demanda de electricidad en el resto de la Isla debido a la aportación al sistema eléctrico de la cogeneradora privada EcoEléctrica y de la Central Termoeléctrica de la AEE en Costa Sur.

La Oficina de Prensa señaló la naturaleza del sistema eléctrico integrado de la AEE que se distingue por poseer unos dispositivos de seguridad que se activan automáticamente en caso de averías o de agresiones repentinas, como se ha evidenciado durante el paso de huracanes, fuertes ráfagas de lluvia y embates de árboles u objetos contundentes.

La AEE confía restablecer el servicio de electricidad a los clientes afectados alrededor de las 3 de la tarde de hoy. (Énfasis suplido.)

El 8 de septiembre la Autoridad emitió un segundo comunicado de prensa en el cual informó que el servicio de electricidad se restableció en un 100% a las 7:50 p.m. del jueves 7 de septiembre. Indicó, además, que esta situación no debería repetirse y nombró un comité técnico para investigar a fondo los detalles relacionados con el incidente.

El 14 de septiembre la Autoridad emitió su último comunicado de prensa sobre este asunto. Entre las conclusiones principales el Comité técnico destacó las siguientes:

- <u>En la condición pre-disturbio el sistema se operaba dentro de los criterios normales.</u>
- Hubo averías genuinas y confirmadas de fase a tierra, tanto en la línea 50,200 como en la 50,300, ambas de 230 mil voltios de capacidad.
- No hubo problemas de estabilidad del voltaje.
- No hay indicios de problemas de inestabilidad de unidades generatrices. (Énfasis suplido.)

Como resultado de esta falla mayor en el sistema de energía eléctrica, en la Rama Judicial se afectaron, además del Tribunal Supremo, los siguientes Centros Judiciales: San Juan, Bayamón, Caguas y Arecibo.[6] En un sentido real y práctico estos Centros Judiciales no realizaron sus labores regulares, ya que sólo permanecieron abiertas algunas de las Salas de Investigaciones y ventanillas para presentación de recursos y documentos. En el Tribunal Supremo sólo permaneció abierta la ventanilla de radicaciones con tres personas para atenderla, el resto del personal se despachó por la imposibilidad de poder realizar trabajo alguno sin el servicio de energía eléctrica.

---

[6] En estos Centros Judiciales se tomaron las siguientes medidas: En San Juan permaneció abierta para el público en general sólo la Sala de Investigaciones, donde también se recibieron documentos para radicación. En esta Sala se atendieron casos del Centro Judicial de Bayamón. En relación con el Centro Judicial de Bayamón propiamente los documentos para radicación

III

Con relación a las obligaciones y a sucesos imprevistos o inevitables el Art. 1058 de Código Civil, 31 L.P.R.A. sec. 3022, nos dice que "nadie responderá de aquellos sucesos que no hubieran podido preverse, o que previstos, fueran inevitables." Para analizar esta disposición hemos utilizado los conceptos de **fuerza mayor y caso fortuito**.

Con relación a su contraparte, el Art. 1105 del Código Civil Español, se ha expresado que éste "trata, sin nombrarlo, del 'caso fortuito'" y que "el término que más frecuentemente es utilizado en relación a él es el de 'fuerza mayor'.... El Art. 1105 recoge su definición tradicional como acontecimiento perjudicial y que excede absolutamente el concepto de diligencia." En cuanto a fuerza mayor se ha dicho que es el acontecimiento, que por su propia naturaleza excede <u>a priori</u> del concepto de diligencia; así que basta enunciarlo para saber que ante él toda diligencia hubiera sido irrelevante." <u>Comentario del Código Civil</u>, Tomo II, Ministerio de Justicia, Badosa Coll, pág. 43, Madrid (1991).

En <u>Rivera</u> v. <u>Caribbean Home Const., Corp.</u>, 100 D.P.R. 106, 110 (1971), al hacer referencia al Art. 1058 expresamos que "ese suceso eximente de responsabilidad – por razón de que no puede preverse o que previsto no puede evitarse – se llama caso fortuito o fuerza mayor. <u>Este concepto amplio, que por estar basado en la equidad puede operar en todo campo de derecho, tiene como su aplicación más importante la de eximir de responsabilidad en el cumplimiento de las obligaciones</u>." (Énfasis suplido.) Como podrá observarse, este concepto de equidad aplicable a las obligaciones lo hemos interpretado de forma amplia, haciéndolo extensivo a todo campo de derecho. Hoy estamos aplicando este sabio principio de equidad que permea todo nuestro ordenamiento a las normas procesales que, después de todo, tienen como único propósito el viabilizar la consecución de los derechos sustantivos.

Con relación a los conceptos de fuerza mayor y caso fortuito, a principio del siglo pasado, en <u>Vidal & Cia., S. en C.</u>, v. <u>Am.R.R. Co.</u>, 28 D.P.R. 204, 210 (1920) hicimos constar que "[f]uerza mayor es el acontecimiento que no hemos podido precaver ni resistir; como por ejemplo la caída de un rayo, el granizo, la inundación, el huracán, la irrupción de enemigos, el acontecimiento de ladrones ...y es caso fortuito el suceso inesperado o la fuerza mayor que no se puede precaver ni resistir... [t]ales ...[como] las inundaciones, torrentes, naufragios, incendios, rayos, violencias, sediciones populares, ruinas de edificaciones causadas por alguna desgracia imprevista y otros acontecimientos semejantes."

IV

En los casos ante nuestra consideración que versan sobre la aplicación de normas procesales, las cuales deben siempre ser interpretadas de forma tal que en todo

---

tuvieron que recibirse en el Cuartel Municipal. De otra parte en Arecibo un alguacil recibió los documentos para radicación.

procedimiento se haga justicia de manera justa, rápida y económica, ocurrió algo que no se podía prever y que no se podía evitar –una interrupción masiva del servicio de electricidad que afectó a toda la zona norte del país, la población de la franja comprendida, entre Arecibo y Fajardo. Esta interrupción masiva fue ocasionada por un corto circuito provocado en una línea de 230 voltios al hacer ésta contacto con unos árboles debido a las condiciones de pre-disturbio que en esos momentos prevalecían en la Isla. No nos cabe la menor duda que el 7 de septiembre la zona norte de la Isla experimentó un acontecimiento que por su naturaleza y magnitud era catalogable como de fuerza mayor o caso fortuito.

Las inclemencias del tiempo ocasionadas por condiciones de pre-disturbio causaron que árboles cercanos afectaran líneas principales de transmisión eléctrica que dejaron sin servicio a medio millón de clientes de la Autoridad, es decir, aproximadamente a más de millón y medio de personas. Esto fue un acontecimiento que no se pudo evitar ni prevenir. Cuatro Centros Judiciales de las zona norte y el propio Tribunal Supremo, tuvieron que, para todos los propósitos prácticos, suspender sus labores. No les fue posible realizar trabajos análogos a los que los letrados en los casos ante nuestra consideración se vieron imposibilitados de llevar a cabo.

No estamos ante un hecho aislado que afectara únicamente a las partes y para el cual debieron haber tenido un plan de contingencia, una alternativa. No fue falta de diligencia, ni el dejar las cosas para última hora lo que les impidió cumplir con los términos fijados por ley.

Las peticionarias tenían treinta (30) días jurisdiccionales para presentar sus recursos. Esto lo hubieran podido hacer si no hubiese sido por el imprevisto acontecimiento de la interrupción masiva del servicio eléctrico en prácticamente toda la zona norte de la Isla. Es claro que bajo estas circunstancias son de aplicación los preceptos de equidad del Art. 1058 del Código Civil que eximen de responsabilidad, en estos casos, del cumplimiento de los términos dispuestos en la Sec. 4.7 de la Ley de Procedimiento Administrativo Uniforme. Reiteradamente hemos resuelto que en nuestro derecho permean los principios de equidad, buena fe y razonabilidad. El derecho es razonable y no exige lo que resulta imposible de cumplir.

Además, no debemos olvidar que "[l]a discreción permite salirse un tanto de la Ley en busca de la justicia..." Pueblo v. Sánchez González, 90 D.P.R. 197, 200 (1964)... su "adecuado ejercicio... está inexorable e indefectiblemente atado al concepto de razonabilidad." Pueblo v. Ortega Santiago, 125 D.P.R. 203, 211 (1990).

Por las razones antes expuestas, disponemos que bajo las circunstancias específicas de estos casos, donde se interpuso un acontecimiento de fuerza mayor al cumplimiento de las obligaciones procesales por parte de los peticionarios, son de aplicación las normas de equidad establecidas en el Art. 1058 del Código Civil. El término jurisdiccional para presentar los recursos vencía el día 8, no el 7 de septiembre de 2000. Por lo tanto,

resolvemos que este Tribunal tiene jurisdicción para considerar, si en los méritos, estos recursos deben ser expedidos.

Se dicta sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Oficina de Ética Gubernamental

     Recurrida

        vi.                                      CC-2000-744

Carmenisa D. Rivera Santos

     Peticionaria

_____

Bethzaida Cintrón Lorenzo

     Peticionaria

        v.                                      AC-2000-66

Depto. de Asuntos del Consumidor

     Recurrido


SENTENCIA


San Juan, Puerto Rico a 12 de enero de 2001


Por las razones expuestas en la Per Curiam que antecede, se dicta sentencia en la cual el Tribunal dispone que bajo las circunstancias específicas de estos casos, donde se interpuso un acontecimiento de fuerza mayor al cumplimiento de las obligaciones procesales por parte de los peticionarios, son de aplicación las normas de equidad establecidas en el Art. 1058 del Código Civil. El término jurisdiccional para presentar los recursos vencía el día 8, no el 7 de septiembre de 2000. Por lo tanto, se resuelve que este Tribunal tiene jurisdicción para considerar, si en los méritos, estos recursos deben ser expedidos.

Lo pronunció, manda el Tribunal y certifica la Subsecretaria del Tribunal Supremo. El Juez Asociado señor Corrada del Río disiente por entender que este Tribunal carece de jurisdicción. El Juez Asociado señor Rebollo López no interviene. El Juez Asociado señor Fuster Berlingeri no intervino.


Carmen E. Cruz Rivera
Subsecretaria del Tribunal Supremo